# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ZIPPYSACK LLC and LF CENTENNIAL LIMITED, | |
| Plaintiffs, | Case No. 16 C 757 |
| v. | Judge Harry D. Leinenweber |
| ONTEL PRODUCTS CORPORATION, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs ZippySack LLC and its licensee, LF Centennial Limited (hereinafter, collectively "ZippySack"), brought this suit against Defendant Ontel Products Corporation ("Ontel") for breach of contract and patent infringement. The dispute arose after Ontel allegedly breached a prior settlement agreement between the parties. The Motion now before the Court is to enforce that settlement [ECF No. 37]. For the reasons stated herein, the Court grants the Motion and dismisses this case.

## I. BACKGROUND

A predecessor lawsuit to the current action was filed in August 2015. At that time, ZippySack alleged that Ontel infringed its patents covering a specialty bed sheet. The sheet, marketed for children, is designed to be zipped up rather than folded and tucked, obviating the everyday drudgery of

making the bed. ZippySack's product is appropriately named "ZippySack," while Ontel's allegedly infringing product is known as "ZipIt Friends." The parties settled the 2015 matter and stipulated to a dismissal with prejudice. *See,* Case No. 1:15-cv-07510.

ZippySack filed the present suit in January 2016, arguing that Ontel breached the settlement agreement. The Complaint also includes a claim for patent infringement, which is essentially the same infringement claim that ZippySack brought in 2015. As part of the settlement, Ontel agreed to cease producing ZipIt Friends, and ZippySack in turn relinquished all relevant legal claims against Ontel. Ontel also agreed that it would sell no more than its existing inventory of ZipIt Friends, which at the time it believed numbered at 80,000. The agreement required Ontel to report monthly on the status of its effort to sell off the remaining inventory.

That number – 80,000 – is at the heart of the current dispute. Shortly after the Court dismissed the predecessor litigation, in November 2015, Ontel sent a letter to ZippySack stating:

> Ontel has discovered a discrepancy that existed with the prior inventory numbers. . . . Specifically, the prior inventory number . . . included only retail inventory. Ontel tracks mail order inventory separately and there was a miscommunication between the business and finance groups when this information was gathered in connection with our discussions, which

- 2 -

> caused it to unintentionally understate its inventory
> number. As such, in accordance with [the settlement],
> Ontel reports that it has 119,432 ZipIt Friends units
> remaining in inventory. Ontel will continue to
> dispose of its inventory in accordance with the terms
> of the [settlement] with respect to the channels of
> distribution and timing.

(Compl. Ex. C.)

ZippySack, concerned about the larger inventory of ZipIt Friends, sent a letter requesting clarification:

> First, does the number 119,432 mean the number of
> ZipIt Friends products that Ontel had on hand as of
> the date of the [settlement], or the number on hand
> now? Either way, ZippySack and LF Centennial do not
> agree to allowing more than 80,000 ZipIt Friends
> products to be sold by Ontel after the [settlement]
> date. Ontel represented . . . that it had 80,000
> units at the time of the [settlement], and that
> representation was a key and material term that led to
> the settlement. We also do not accept as reasonable
> that Ontel could be 150% off from its representation –
> or even more if the 119,432 is a current number and
> not a past number. Please confirm today that any
> surplus products above 80,000 units as of the time of
> the [settlement] will be destroyed or sold outside the
> United States or Canada.

(Compl. Ex. D.)

The last quoted sentence is a mystery to the Court, because the settlement doesn't appear to contain a provision allowing Ontel to manufacture and sell ZipIt Friends outside the United States and Canada. There also appears to be some confusion between the parties on this point. Regardless, Ontel responded that it had not "sold any of the excess mail order inventory that was discovered," and that it was "exploring channels to sell this

excess mail order inventory outside of the U.S., including in Canada." (Compl. Ex. E.) Ontel further argued that ZippySack's "refusal to accommodate [Ontel] despite [its] oversight is not reasonable," and it offered ZippySack royalties on potential sales of the excess inventory. (*Id.*)

In response to the back-and-forth, ZippySack filed the present lawsuit. In a recent hearing before the Court, Ontel's counsel stated that it still had not sold in excess of 80,000 ZipIt Friends, and that it had no intention of doing so "until there's an arrangement made with plaintiff pursuant to which the plaintiff agrees that they may be sold." (Pl.'s Mot. Ex. B.) Ontel's counsel agreed that his client would put that representation in writing, after which ZippySack would withdraw the suit. The Court thought the matter resolved, but then Ontel filed its written representation, and it contained the following paragraph:

> In an effort to resolve this dispute, Ontel previously agreed and again agrees that it will not sell this excess on-line/mail order inventory in the U.S. prior to reaching an agreement with Plaintiffs under what terms this on-line/mail order inventory may be disposed. *However, such agreement must not be unreasonably withheld by Plaintiffs.*

(Pl.'s Mot. Ex. C) (emphasis added).

ZippySack objected to the final sentence of the representation, and the dispute endured.

## II. **JUSTICIABILITY UNDER ARTICLE III**

In a response brief that barely runs 3 double-spaced pages, Ontel states that ZippySack does not raise a justiciable issue in its Motion to enforce the settlement. While the argument is acutely underdeveloped, the issue is a legitimate and important one: as a threshold matter, the Court must decide whether there is an actual case or controversy for proper judicial resolution. *See,* U.S. Const. art. III, § 2, cl. 1.

ZippySack requests relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), asking the Court to declare the settlement agreement valid and enforceable against Ontel. Ontel responds that because it has not breached the settlement (and supposedly has no plans to breach), there is no actual controversy within the meaning of Article III. It cites one Seventh Circuit case over 30 years old to support this proposition: *Crown Drug Co. v. Revlon,* 703 F.2d 240, 243 (7th Cir. 1983). In that case, the plaintiffs feared potential legal action from the defendant, because the plaintiffs produced and distributed a drug similar to the defendant's drug. The plaintiffs filed a lawsuit preemptively, asking the district court to declare that their conduct did not violate the Lanham Act and certain Illinois laws governing unfair trade practices. *Id.* at 241.

The Seventh Circuit, closely scrutinizing the facts, held that the plaintiffs "failed to identify a single instance in which the defendants complained, threatened to sue, or even contacted the plaintiffs or any other manufacturers about the sale [of infringing products]." *Id*. at 244. In other words, the plaintiffs jumped the gun; the dispute may have been plausible, but it was also entirely hypothetical when they rushed to court seeking a declaratory judgment.

More directly on point is the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), although Ontel doesn't cite it. The case involved a license agreement under which MedImmune agreed to pay Genentech royalties on sales of licensed products covered by certain patent rights. *Id*. at 121. The license acted like a preemptive settlement to a potential infringement claim; it defined "licensed products" as drugs that, if not for the license, would infringe one of Genentech's patents. Trouble came when Genentech claimed that MedImmune's most successful drug qualified as a licensed product, triggering royalty payments. *Id*. at 121-22. MedImmune disagreed and filed suit, requesting declaratory relief. However, MedImmune began paying royalties on its sales of the drug anyway, as if it agreed with Genentech. *Id*. at 122. To avoid excess hassle, MedImmune declined to breach.

These facts raised the question: was MedImmune first required to breach the license agreement in order to have a justiciable case or controversy, such that a court could consider its request for a declaratory judgment on the underlying patents? The Supreme Court definitively answered "no." *Id*. at 137. The Court noted that, if MedImmune had breached, the company would have risked severely adverse consequences, including treble damages and an injunction against further sales. *Id*. at 133-34. Genentech effectively coerced MedImmune into paying royalties, which was sufficient to confer standing (an "injury in fact") to request declaratory relief under Article III.

The present case is admittedly somewhat different. Here, it is Defendant's inaction, not Plaintiff's, which precludes a breach. Nevertheless, like Genentech, Ontel is the party engaging in the coercive conduct while simultaneously arguing for lack of justiciability. Consider the facts: the parties reached a settlement and agreed to dismiss the former lawsuit. But Ontel discovered it had made a mistake during negotiations, and it now wishes to change an important term of the settlement. True that it has stopped short of an explicit threat to breach, but it has dropped furtive hints throughout these proceedings that it will not comply. For example, one of Ontel's letters stated that it was "exploring channels" to sell additional ZipIt

Friends, and accused ZippySack of being unreasonable in attempting to hold it to the terms of the settlement. Ontel later submitted a declaration to the Court admitting an active dispute, and ominously stating that ZippySack must not unreasonably withhold consent for Ontel to sell off its excess inventory. Finally, and perhaps most telling, at the most recent hearing, Ontel's counsel stated that the estimated $400,000 – $770,000 Ontel would forego because of the settlement's terms against sale of more than 80,000 ZipIt Friends was too much to bear: "[Ontel] felt that that was too large a penalty to take, and so [Ontel] would like to go forward with the litigation." (Hr'g Tr. from Feb. 24, 2016, ECF No. 34.)

So it is puzzling for Ontel to claim now that the terms of the settlement "are not disputed." (Def.'s Reply Br. at 2-3). From ZippySack's perspective, Ontel's existing inventory was obviously a key issue during settlement negotiations. The final agreement contained a term enabling ZippySack to monitor Ontel's remaining units on an ongoing basis. ZippySack reasonably may be concerned that 40,000 additional ZipIt Friends in circulation would hurt its sales and cause consumer confusion (and at a recent hearing, Ontel told the Court that the additional units could actually number up to 70,000). A breach also threatens to

revive the underlying claims for patent infringement, causing ZippySack further expense and headache.

The facts reveal a concrete dispute between the parties, wholly different from the hypothetical legal challenge imagined by the plaintiffs in *Crown Drug Co. v. Revlon.* Moreover, ZippySack has plausibly alleged "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune,* 549 U.S. at 127 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil,* 312 U.S. 270, 273 (1941).

### III. <u>THE SETTLEMENT AGREEMENT</u>

A brief procedural side note: the parties negotiated the settlement on their own, without judicial supervision, and the Court subsequently dismissed the 2015 lawsuit with prejudice. That means there must be some independent basis for subject-matter jurisdiction for the Court to enforce the settlement; jurisdiction is not retained post-settlement unless the Court explicitly decides to retain it. *See, id*. Here, the parties are diverse and the amount in controversy (roughly determined by reference to the 40,000 – 70,000 additional ZipIt Friends Ontel wants to sell) meets the statutory requirement for diversity jurisdiction. *See,* 28 U.S.C. § 1332(a). Illinois law applies, as the settlement was negotiated here, and it contains a

provision indicating that Illinois law will govern disputes. *See, Midwest Grain Prods. v. Productization, Inc.,* 228 F.3d 784, 788 (7th Cir. 2000). And in Illinois, a settlement agreement is enforceable "just like any other contract." *Lynch, Inc. v. SamataMason Inc.,* 279 F.3d 487, 489 (7th Cir. 2002).

The settlement is fairly straightforward. The parties relinquished all relevant legal claims, subject to compliance with the other terms of the agreement. This included Ontel's promise that it would not challenge the validity of the underlying ZippySack patent. The key clause regarding inventory reads:

> Ontel represents that is has no more than approximately 80,000 current units of the ZipIt Friends product in existing on-hand inventory or goods to be delivered from its manufacturer(s) (the "Inventory"), and the Parties agree that Ontel may sell off that Inventory and shall not thereafter sell any further ZipIt Friends product after that Inventory is exhausted.

(Compl. Ex. B.)

The clause is unambiguous. It clearly defines "Inventory" to mean "no more than approximately 80,000" units. Thus, Ontel cannot sell more than that number, and the word "approximately" cannot be read reasonably to include thousands of additional units.

That the parties styled the settlement a "memorandum of understanding" has no effect on its finality. They may have

intended to work out additional terms at a later date, but they undoubtedly intended to be bound by the document: "This Confidential Memorandum of Understanding is a legally binding contract. . . . The Parties shall then use commercially reasonable efforts to negotiate and enter into a final detailed agreement, which will then replace and supersede this Memorandum of Understanding." (Compl. Ex. B.) As the Seventh Circuit has noted, "[t]he fact that a formal written document is anticipated does not preclude enforcement of a specific preliminary promise." *See, Dawson v. General Motors,* 977 F.2d 369, 374 (7th Cir. 1992) (applying Illinois law). That is especially true here, where ZippySack relied on the agreement by stipulating to dismiss the suit with prejudice. *See, id*. And this is not a case in which the preliminary agreement contains a host of terms making performance subject to future contingencies, casting doubt on the enforceability of initial representations. *See, Empro Mfg. Co. v. Ball-Co Mfg.,* 870 F.2d 423, 425 (7th Cir. 1989) (letter of intent not binding where terms were explicitly subject to negotiation of a formal, definitive agreement and receipt of shareholder approval).

Ontel's only discernable defense against enforcement is unilateral mistake of fact. It thought it had only 80,000 remaining ZipIt Friends, and then later learned it had neglected its mail-order inventory; now the number is significantly

higher.  The defense of unilateral mistake is available under Illinois law where the aggrieved party "shows by clear and convincing evidence that (1) the mistake is of a material nature; (2) the mistake is of such consequence that enforcement is unconscionable; (3) the mistake occurred notwithstanding the exercise of due care by the party seeking rescission; and (4) rescission can place the other party in status quo." *Blue Cross Blue Shield v. BCS Ins.*, 517 F.Supp.2d 1050, 1061 (N.D. Ill. 2007) (quotation and citation omitted).

Ontel's mistake does not invalidate this contract, because enforcement on these terms is not unconscionable.  Under Illinois law, "[a] contract is unconscionable when, viewed as a whole, it is improvident, oppressive, or totally one-sided." *Id*. (quotation and citation omitted).  The parties had full and fair opportunity to negotiate the preliminary terms of settlement.  If Ontel believed that it had a strong case for the invalidity of the ZippySack patent, it could have continued litigating in 2015.  Instead, it relinquished its rights to produce ZipIt Friends going forward, and at the time, it thought the right to offload 80,000 existing units was an acceptable tradeoff to ending the suit.  Its mistake was not clerical; by all accounts, Ontel believed that 80,000 was the correct number at the time.  If the term was acceptable to Ontel then, it is not unconscionable now.  It is also unclear how Ontel could have

exercised due care when its estimate was so far off the mark (and inexplicably, that estimate has continued to grow).

In sum, the Court holds that the settlement is valid and enforceable against both parties. The term calculating Ontel's inventory at 80,000 stands; unless ZippySack consents, the agreement forbids Ontel from selling more units after exhausting that 80,000. Ontel's representation that ZippySack must not unreasonably withhold consent for it to sell more units finds no support in the contract or in any other evidence before the Court. Ontel is stuck with the terms of the contract that it negotiated and signed.

Resolution of this Motion disposes of the entire case. ZippySack's resurrected patent infringement claim is dismissed as moot. The settlement required the parties to relinquish the infringement claim, and the Court is enforcing the terms of that settlement. The claim for breach of contract likewise is dismissed because there has been no material breach (so far). Lastly, the Court dismisses ZippySack's claim for attorneys' fees; ZippySack does not develop adequately its argument for fees, and in Illinois, "absent a statute or contractual provision, a successful litigant must bear the burden of his or her own attorney's fees." *Fednav Intern. Ltd. v. Continental Ins.*, 624 F.3d 834, 839 (7th Cir. 2010) (quotation and citations

omitted).  However, ZippySack may petition for any other costs allowed under Federal Rule of Civil Procedure 54(d).

## IV. CONCLUSION

For the reasons stated herein, Plaintiffs' Motion to Enforce the Settlement Agreement [ECF No. 37] is granted.  The case is dismissed.

**IT IS SO ORDERED.**

                                                                       _____
                                                                       Harry D. Leinenweber, Judge
                                                                       United States District Court

Dated: April 19, 2016